UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

UNITED STATES                               CRIMINAL ACTION

VERSUS                                      NO: 13-66

WALTER PORTER                               SECTION: R

## ORDER AND REASONS

Defendant Walter Porter moves the Court to suppress the testimony of former police officer Beau Gast and any information derived from a "Field Interview Card" that Gast created after a January 26, 2011 traffic stop of Porter.[1] For the following reasons, the Court denies the motion.

## I.  BACKGROUND

On April 17, 2014, a federal grand jury returned a second superseding indictment against Walter Porter, charging him with the November 21, 2010 murder of Christopher Smith.  Specifically, Porter is charged with committing murder-for-hire (Count 2) and causing death through a firearm (Count 3), as well as conspiracy to possess firearms (Count 4).[2]  Porter pleaded not guilty, and his jury trial is scheduled for March 7, 2016.

---

[1]     R. Doc. 311.

[2]     R. Doc. 99.

According to the Government's theory of the case, co-defendant Nemessis Bates hired Porter and co-defendant Aaron Smith to kill the victim after the victim stole Bates's jewelry.   While the New Orleans Police Department's murder investigation was ongoing, on January 26, 2011, former NOPD officer Beau Gast conducted a traffic stop of an African-American male driving a black 2008 Mercedes-Benz in New Orleans, Louisiana.   According to a "Field Interview Card" that Gast created during or after the stop, Gast stopped the vehicle for an unspecified "traffic violation."[3]  The Field Interview Card does not reveal any additional information regarding the nature of the traffic violation or Gast's justification for making the stop.  The Field Interview Card also indicates that Walter Porter was driving the Mercedes at the time of the stop.[4]  In addition to Porter's name, Gast noted Porter's race, gender, date of birth, height, and weight on the Field Interview Card.[5]  It is undisputed that Gast did not arrest Porter or issue him a traffic citation; nor did he conduct a search of the vehicle.[6]   It is also undisputed that Porter did not own the

_____

[3]      R. Doc. 311, Exhibit A, at 1.  The card does not reveal any more information regarding the nature of the traffic violation or the surrounding circumstances.

[4]      *Id.*

[5]      *Id.*

[6]      R. Doc. 311-1 at 2; R. Doc. 335 at 1.

2

Mercedes that he was driving on January 26, 2011. Rather, the vehicle belonged to co-defendant Nemessis Bates.

Two years after this traffic stop, in February 2013, the Government filed in this Court an Application for Court Order for Disclosure of Historical Cell-Site Records[7] pursuant to the Stored Communications Act ("SCA"), 18 U.S.C. §§ 2701-2712. The Government's application requested historical cell site records for a phone number the Government believes to be associated with Porter for the time period surrounding the November 21, 2010 murder of Christopher Smith.[8] The Government identified the following evidence, among other evidence, pointing to Porter's involvement in the Smith murder:

- A ballistics analysis determining that the same firearm used to kill Christopher Smith was also used in the attempted murder of John Matthews, a crime for which Porter has been charged;

- A confidential source ("CS1") told investigators that Nemessis Bates had referred to two men that CS1 saw at Bates's business as "the killers";

- CS1 also told investigators that Nemessis Bates told him/her that Bates owed those two men money for killing Smith;

- CS1 identified from two separate six-person photographic line-ups Aaron Smith and Walter Porter as the two people he/she had seen at Bates's business and that Bates had referred to as "the killers";

---

[7] *See* R. Doc. 335-2.

[8] *See id.*

3

- Aaron Smith told investigators that he was an associate of Porter;

- Phone records for Aaron Smith revealed that on the day of Christopher Smith's murder, Aaron Smith received an incoming call from a number that investigators knew to be used by Porter;

- The number that investigators knew to be used by Porter had also called Bates several times in November and December 2010, after the murder of Christopher Smith;

- Another confidential source ("CS2"), who was a "close associate" of Porter's told investigators that Porter told CS2 that Bates hired Porter and Aaron Smith to kill someone;

- Days after the Smith murder, a Florida Highway Patrol officer stopped Porter for a traffic violation while Porter was driving a red Toyota Camry, which was rented in Bates's name; and

- Months after the Smith murder, a NOPD officer stopped Porter for a traffic violation while Porter was driving a black Mercedes-Benz, which was Bates's personal vehicle.

Based on the foregoing information, the Magistrate Judge found that the Government had offered specific and articulable facts showing that there are reasonable grounds to believe that the requested records were relevant and material to the Government's ongoing murder investigation.[9] On February 28, 2011, the Magistrate Judge granted the Government's application and ordered AT&T to disclose the requested records under 18 U.S.C. § 2703(d).[10]

---

[9] *Id.*

[10] *Id.*

Porter now moves to suppress Gast's testimony, the introduction of the Field Interview Card, and the cell phone records obtained in February 2011. First, Porter argues that the traffic stop violated his Fourth Amendment rights because Gast had no reasonable, articulable suspicion for stopping the vehicle that Porter was driving.  Porter also argues that because the traffic stop was unlawful, the Court must exclude the cell phone records under the "fruit of the poisonous tree" doctrine because the Government's application for those records "relied, in large part, on . . . Officer Gast's [Field Interview Card] linking Mr. Porter to Nemesis Bates' Mercedes."  Second, Porter argues that the traffic stop violated his Fifth Amendment rights because merely identifying himself as Walter Porter was self-incriminating.  The Government opposes the motion.

## II.   DISCUSSION

In his motion, Porter contests the legality of the traffic stop conducted by Gast, as well as the propriety of the Government "subsequent, derivative use of [the] stop to obtain cell tower records" related to its investigation of the murder of Christopher Smith.

## A.    Lawfulness of the Traffic Stop

The Fourth Amendment protects against unreasonable searches and seizures.  U.S. Const. amend. IV.  Stopping a vehicle and detaining its occupants is a seizure within the meaning of the Fourth Amendment.  *United States v. Jones*, 234 F.3d 234, 239 (5th Cir. 2000).  A traffic stop is therefore "subject to the constitutional imperative that it not be 'unreasonable' under the circumstances."  *Whren v. United States*, 517 U.S. 806, 810 (1996).  Courts "analyze the legality of traffic stops for Fourth Amendment purposes under the [reasonable suspicion] standard articulated in *Terry v. Ohio*."  *United States v. Grant*, 349 F.3d 192, 196 (5th Cir. 2003).  This involves a two-part inquiry into "(1) whether the officer's action was justified at its inception and (2) whether the search or seizure was reasonably related in scope to the circumstances that justified the stop in the first place."  *Id.* (citing *Terry v. Ohio*, 392 U.S. 1, 20 (1968)).

Here, Porter argues that the Government cannot carry its burden of demonstrating that Gast's initial decision to stop the vehicle in which Porter was driving was justified.  Gast admits that he has no independent recollection of why he stopped Porter's vehicle, what transpired during the stop, or how long Porter was detained.  Further, Porter contends that the Field Interview Card only conclusorily stated that Porter committed a "traffic violation."

6

While the Government filed an opposition memorandum, it concedes that "because Officer Gast is unable to recall the lawful stop which prompted him to issue a [Field Interview Card], the government does not deem his testimony to be particularly probative in its case-in-chief."[11]   Accordingly, the Government represents that it will not seek to introduce either the Field Interview Card or Gast's testimony in its case-in-chief.[12]

In light of the Government's representation, the Court need not rule on Porter's motion to suppress the Field Interview Card and Gast's testimony at this time.  Should the Government change course, the Court will decide the relevant issues at that time.  The Government shall notify the Court in advance of any change of position regarding the proffered use of this evidence.

### B.   The Historical Cell Site Records Are Not Suppressible As Fruits of the Poisonous Tree

Porter argues that if the Court finds that Gast's January 2011 traffic stop was unlawful, then it must suppress not only Gast's Field Interview Card and testimony but also the historical cell site records that the Government obtained two years later, during its investigation into the murder of Christopher Smith.  This argument fails because even if Gast's traffic stop were

---

[11]      R. Doc. 368 at 2.

[12]      *Id.* at 3.

7

unlawful, the connection between the illegality and the historical cell site records "is 'so attenuated as to dissipate the taint.'"   *United States v. Grosenheider*, 200 F.3d 321, 327 (5th Cir. 2000) (citing *Nardone v. United States*, 308 U.S. 338, 341 (1939)).

As noted, the Government acquired the relevant records in February 2013 by applying for and securing a court order, pursuant to the Stored Communications Act ("SCA").  Briefly, the SCA provides several methods by which the Government may require a service provider to disclose non-content records or other subscriber information, including securing a court order for the records.  18 U.S.C. § 2703(c).  Upon the Government's application, a court order "shall issue only if the governmental entity offers specific and articulable facts showing that there are reasonable grounds to believe that the . . . records or other information sought, are relevant and material to an ongoing criminal investigation."  *Id.* at 2703(d).

Here, Porter does not allege that the Magistrate Judge lacked jurisdiction over the Government's § 2703(d) application.  Nor does he contend that the application contained some technical error.  Rather, he argues that because that application "relied, in large part, on . . . Officer Gast's [Field Interview Card] linking Mr. Porter to Nemesis Bates' Mercedes"  the historical cell site records must be suppressed as fruits of the poisonous tree.

8

"[T]he exclusionary rule prohibits the introduction at trial of all evidence that is derivative of an illegal search, or evidence known as the 'fruit of the poisonous tree.'" *United States v. Hernandez*, 670 F.3d 616, 620 (5th Cir. 2012) (quoting *United States v. Singh*, 261 F.3d 530, 535 (5th Cir. 2001)). "The primary limit on this rule is that otherwise suppressible evidence will still be admitted if the connection between the alleged illegality and the acquisition of the evidence is 'so attenuated as to dissipate the taint.'" *Grosenheider*, 200 F.3d at 327 . One example of this "attenuation" limitation is the independent source doctrine, which provides that "information which is received through an illegal source is considered to be cleanly obtained when it arrives through an independent source." *United States v. Hearn*, 563 F.3d 95, 102 (5th Cir. 2009) (citing *Murray v. United States*, 487 U.S. 533, 538–39 (1988)). For example, seizure of evidence pursuant to a warrant may satisfy the independent source exception, resulting in the admission of evidence obtained during the lawful search. *Id.* When a warrant application relies on unlawfully obtained information, however, the Government must make two showings: "(1) that the police would still have sought a warrant in the absence of the illegal search; and (2) that the warrant would still have been issued (*i.e.*, that there would still have been probable cause to support the warrant) if the supporting affidavit had not contained information stemming from the illegal

9

search." *United States v. Runyan*, 290 F.3d 223, 235 (5th Cir. 2002); *see also United States v. Hassan*, 83 F.3d 693, 697 (5th Cir. 1996).

Having reviewed the available record, the Court finds that the Government meets its burden with respect to both prongs of the analysis. As to the first prong, the Government contends that a significant amount of investigatory work preceded its application for historical cell site records. The Government further contends that authorities did not pursue a court order for those records until after they received evidence from several different sources suggesting Porter's involvement in the murder of Christopher Smith. Finally, the Government contends that Gast's traffic stop, which occurred two years before the application was filed, played a *de minimus* role in the investigation.[13]

The Government's § 2703(d) application supports these assertions. In the nine-page application, the Government outlined the status of its then-ongoing murder investigation in detail. The Government identified numerous sources of evidence suggesting Porter's involvement in the Smith murder. This evidence included, among other items: a ballistics analysis indicating that the firearm used to kill Christopher Smith was also used in the attempted

---

[13]        R. Doc. 335 at 13-15.

murder of John Matthews, a crime for which Porter was charged; statements by CS1 indicating that CS1 had seen Porter and Aaron Smith at Bates's carwash and that Bates indicated that he owed both men money for killing Christopher Smith; statements from Aaron Smith indicating that he was Porter's associate; phone records that document contacts between Aaron Smith, Bates, and a number believed to be associated with Porter on the day Christopher Smith was killed; and statements by CS2, a "close associate" of Porter's, indicating that Porter told CS2 that Bates hired Porter and Aaron Smith to kill someone.[14] While the application also refers, in a single sentence, to Gast's traffic stop, it is clear from the evidence outlined elsewhere in the application that the Government would have sought the historical cell site records that it believed to be associated with Porter even if Gast's traffic stop had never occurred. *Cf. United States v. Getachew*, 364 F. App'x 931, 934 (5th Cir. 2010) (applying independent source rule when officer who executed warrant testified that the warrant was sought based on evidence untainted by an illegal protective sweep); *United States v. Cabaniss*, 286 F. App'x 196, 199 (5th Cir. 2008) (finding that even if stop of defendant's vehicle was unlawful, independent source rule applied to subsequent search when search warrant application was

---

[14] *See* R. Doc. 335-2.

primarily supported by a confidential informant's tip and the supporting affidavit demonstrated that "the police had corroborated numerous details of this particular tip apart from any fruit of the allegedly unconstitutional seizure").

The second prong is also satisfied for similar reasons.  To establish that a search warrant would still have been issued even without reference in the supporting affidavit to information derived from the illegal search, the Government need not provide subjective proof that the magistrate in fact would have issued the warrant without that evidence.  *See Runyan*, 290 F.3d at 236 (citing *United States v. Restrepo*, 966 F.2d 964, 970 (5th Cir. 1992)).  Rather, it must show only that, purged of taints, the warrant contained sufficient evidence to constitute probable cause for its issuance.  *Id.*  Here, however, the Government obtained the historical cell site records not through a search warrant but, rather, by securing a court order under the SCA, 18 U.S.C. § 2703(d).  Such applications require "a lesser showing than the probable cause standard that is required by the Fourth Amendment to obtain a warrant."  *In re U.S. for Historical Cell Site Data*, 724 F.3d 600, 606 (5th Cir. 2013).  The entity requesting records pursuant to § 2703(d) need only demonstrate "specific and articulable facts" showing "reasonable grounds to believe" that the records are "relevant and material to an ongoing criminal

investigation." 18 U.S.C. § 2703(d). Thus, the relevant inquiry in this case is whether, after excising the information obtained during Gast's allegedly unlawful traffic stop, the Government's § 2703(d) application contained sufficient facts to demonstrate that the historical cell site records were relevant and material to the investigation.

In any event, the Government's § 2703(d) application is sufficient under either standard. Purged of all unlawful material, the application and supporting affidavit provide enough evidence to support either a finding of "specific and articulable facts" or of probable cause. Among other evidence suggesting Porter's involvement in the murder of Christopher Smith, the affidavit described statements from CS2, a "close associate" of Porter's. CS2 told authorities that Porter had revealed to CS2 that Porter and Aaron Smith killed someone for a man who works at a carwash.[15] According to CS2, Porter said that man was unable to pay the entire cost of the hit, so he instead let Porter borrow his black Mercedes Benz and also rented a red Toyota Camry for Porter to drive as partial payment.[16] Statements from another confidential source, CS1, provided partial corroboration. According to the Government's affidavit, CS1 told authorities that, after Christopher Smith's murder, he/she

---

[15] *Id.* at 7.

[16] *Id.*

13

was with Bates at Bates's carwash when two men approached and handed Bates keys to Bates's black Corvette.[17]  When CS1 asked Bates why he lent his car to those men, Bates replied that he owed them money for killing Christopher Smith.[18]  Later, CS1 identified the men from two photo lineups as Porter and Aaron Smith.[19]

Other evidence in the affidavit corroborates the accounts of both confidential sources.  As to Porter's alleged involvement in the murder-for-hire, the affidavit states that a ballistics analysis of the firearm used to kill Christopher Smith indicated that the same weapon was also used in the attempted murder of John Matthews, a crime for which Porter was charged.[20]  As to the relationship between Porter, Aaron Smith, and Bates, the Government's application states that Aaron Smith informed investigating agents that he was an associate of Porter's;[21] Aaron Smith's call records revealed that on the day of Christopher Smith's murder, Aaron Smith received

---

[17]     *Id.* at 4.

[18]     *Id.*

[19]     *Id.* at 5.

[20]     *Id.* at 2.

[21]     *Id.* at 5.

an incoming call from a number that investigators knew to be used by Porter;[22] and call records further revealed that the number that investigators knew to be used by Porter also called Bates several times in November and December 2010, after Christopher Smith was killed.[23] Finally, as the confidential sources' account that Bates owed Porter money for the murder and lent him cars as partial payment, the affidavit states that days after Christopher Smith was murdered, a Florida Highway Patrol officer stopped Porter while Porter was driving a vehicle rented in Bates's name.  Consistent with CS2's account, the vehicle was a red Toyota Camry.[24]

It is true that Gast's traffic stop provided some additional corroboration on one aspect of CS2's account by placing Porter in Bates's black Mercedes in addition to the rented Toyota Camry.  Even without this information, however, the remaining evidence in the Government's § 2703(d) application demonstrated "specific and articulable facts" showing "reasonable grounds to believe" that records for a phone believed to be associated with Porter were "relevant and material" to the investigation into the murder of Christopher Smith.  18 U.S.C. § 3703(d).   Indeed, the statements provided by both

---

[22]     *Id.* at 5-6.

[23]     *Id.* at 7.

[24]     *Id.* at 7-8.

confidential sources, which were corroborated by one another and by other evidentiary sources, provided probable cause to believe that the phone records would contain evidence implicating Porter in that crime. *See United States v. Thomas*, 627 F.3d 146, 159 (5th Cir. 2010) (noting that "[a] probable cause determination is a practical, common-sense decision as to whether, given all the circumstances set forth in the affidavit, there is a fair probability that contraband or evidence of a crime will be found in a particular place"); *United States v. Satterwhite*, 980 F.2d 317. 321 (5th Cir. 1992) (approving of an affidavit that "provided the magistrate with facts, and not mere conclusions"); *see also United States v. Shugart*, 889 F. Supp. 963, 970-71 (E.D. Tex. 1995), *aff'd*, 117 F.3d 838 (5th Cir. 1997) (finding that affidavit relating information from confidential informant supported finding of probable cause when Government did not rely exclusively on uncorroborated accusations of confidential informant but conducted independent investigation to corroborate information); *United States v. Glover*, No. CIV.A. 11-290, 2012 WL 3548039, at *8 (E.D. La. Aug. 16, 2012) ("Even without the information in the affidavit concerning contraband in the residence, the tip from [Drug Enforcement Administration] Phoenix, when corroborated by agents with [Drug Enforcement Administration] New Orleans, provided probable cause that contraband would be found in the residence.").

16

Because the Government would have sought an order mandating the disclosure of the historical cell site records even had Gast never conducted an allegedly unlawful traffic stop, and because the Magistrate Judge's § 2703(d) court order would still have issued even without evidence of that event, the Court concludes that the records were obtained through an independent source.  Thus, they need not be suppressed.


## III.   CONCLUSION

For the foregoing reasons, the Court DENIES Porter's motion to suppress.

New Orleans, Louisiana, this 18th day of February, 2015.

_____Sarah Vance_____

SARAH S. VANCE
UNITED STATES DISTRICT JUDGE