## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF LOUISIANA

UNITED STATES                                   CRIMINAL ACTION


VERSUS                                          NO: 13-66


WALTER PORTER                                   SECTION: R


## ORDER AND REASONS

Defendant Walter Porter moves the Court to suppress out-of-court and in-court identifications of Porter by Milton Keith Hamilton.[1] For the following reasons, the Court denies the motion.


## I.    BACKGROUND

Porter is charged with murdering Christopher Smith on November 21, 2010. Specifically, a second superseding indictment charges Porter with committing murder-for-hire (Count 2) and causing death through a firearm (Count 3), as well as conspiracy to possess firearms (Count 4).[2] Porter pleaded not guilty, and his jury trial is scheduled for March 7, 2016.

---

[1] R. Doc. 313.

[2] R. Doc. 99.

According to the Government's theory of the case, co-defendant Nemessis Bates hired Porter and co-defendant Aaron Smith to kill the victim after the victim stole Bates's jewelry. Bates was tried by jury and found guilty in June 2015.

### A.    Hamilton's Trial Testimony

During Bates's trial, the Government introduced testimony from Bates's ex-boyfriend, Milton Keith Hamilton.[3] Hamilton testified, in relevant part that Bates told him that Christopher Smith had stolen his jewelry. According to Hamilton, Bates was very upset about the theft. Hamilton testified that Bates eventually admitted to Hamilton that he ordered a "hit" on Christopher Smith. Hamilton testified that Bates asked him for money to pay off the killers, but Hamilton refused to become involved.

Hamilton also testified that during this time period, he regularly visited Bates at a carwash that Bates owned. During one such occasion, Hamilton inquired about Bates's Mercedes.[4] Bates responded that he had placed "a $10,000 hit" and that the killers had taken the Mercedes as collateral.[5]

––––––––––––––––––––

[3] Unless otherwise noted, the Court takes all facts concerning evidence presented at Bates's trial from its September 10, 2015 order denying Bates's motion for a judgment of acquittal and a new trial. R. Doc. 284.

[4] R. Doc. 313-4 at 14 ("Hamilton Trial Transcript").

[5] *Id.* at 14-15.

Hamilton further testified that he began to notice two individuals frequenting the carwash in a white Chevrolet Trailblazer.  On one occasion, Bates told Hamilton, "Well, there they go.  They're looking for their money," which prompted Hamilton to memorize the white Trailblazer's license plate number.[6] In his testimony, Hamilton identified the driver of the white Trailblazer as Aaron Smith and the passenger as Porter.  When asked how many times he had seen these men in the white Trailblazer at the carwash, Hamilton testified, "several--or maybe a dozen times."[7]

Hamilton also testified that on December 25, 2010, Bates arrived at Hamilton's house asking for money.  Hamilton testified that he saw a white Trailblazer parked outside but that he "could not see who was in it because it was nighttime."[8]  According to Hamilton, Bates said, "[D]o you have any money?  Because they putting pressure.  I think they're going to kill me." Hamilton refused to give Bates any money.

Finally, Hamilton testified to a home invasion and shooting that occurred on June 11, 2011, six months after Bates asked Hamilton for money at his house.  Hamilton testified that on that day, Aaron Smith and Porter

[6] *Id.* at 16-17.

[7] *Id.* at 19.

[8] *Id.* at 20, 30.

3

broke into Hamilton's house, shooting and injuring Hamilton, and shooting and killing his long-time partner, Anthony Wilmore.

The Government produced evidence corroborating much of Hamilton's account.  Aaron Smith testified at length concerning the murder-for-hire plot. According to Aaron Smith, Bates offered to pay him and Porter $20,000 for the murder of Christopher Smith.  He further testified that on the morning after Porter carried out the "hit," Aaron Smith and Porter went to Bates's carwash to collect their fee.  Consistent with Hamilton's account, Aaron Smith testified that because Bates was unable to pay  the entire cost of the hit, he gave his Mercedes to Aaron Smith and Porter as collateral.  He further testified that over the course of several months he and Porter met Bates at the carwash multiple times in attempts to collect the money.

The Government also introduced the testimony of Federal Bureau of Investigations Special Agent William C. Williams, who the Court accepted as an expert in the field of historical cell site analysis.  Special Agent Williams testified that phone records for a phone associated with Porter indicated that Porter was in the vicinity of Bates's carwash on several occasions following Christopher Smith's murder in November 2010.

### B.   Porter's Allegations of Police Misconduct

As noted, during Bates's trial in June 2015, Hamilton testified to a home invasion and shooting that occurred at his residence on June 11, 2011.  It is undisputed that on that day, two gunmen broke into Hamilton's home.  A struggle ensued, and the gunmen shot Hamilton, and shot and killed Hamilton's partner, Wilmore.  During Bates's trial in June 2015, Hamilton testified that the two gunmen were Aaron Smith and Porter.

In this case, Porter is not charged with any crime stemming from the June 11, 2011 home invasion and shooting.  In his motion to suppress, however, Porter alleges that the New Orleans Police Department's ("NOPD") investigation of that crime was "shoddy" and that suggestive remarks that one detective made to Hamilton tainted any identifications of Porter that Hamilton might provide in this case.

According to Porter, during the months that followed the June 11, 2011 home invasion, Hamilton worked closely with law enforcement and even conducted his own investigation into the identity of the gunmen who shot him and killed Wilmore.  Despite these efforts, however, Hamilton was allegedly unable to make any firm identification.[9]  Porter alleges that Hamilton did not

---

[9] R. Doc. 313-1 at 2-5.  Porter alleges, for instance, that although Hamilton identified Aaron Smith as a suspect in the home invasion in July 2011, Hamilton failed to identify Aaron Smith when law enforcement showed him a single color photograph.

identify Porter as one of the gunmen until some time after October or November 2011.  Porter alleges that during that time period, NOPD Detective Orlando Matthews informed Hamilton that bullet casings recovered from Hamilton's home matched casings found at the scene of the murder of a different individual, Curtis Matthews, and that Porter was a suspect in that shooting.   According to Porter, this statement was highly suggestive, particularly as it was made at a time when "the murder case had run cold" and Hamilton "was understandably willing and eager to aid the police in . . . [solving] the murder of his long-time partner."  Porter alleges that it was not until Detective Matthews made this statement that Hamilton began "connecting the two together" and believing that Porter was involved in the home invasion.

As evidence of Detective Matthews's influence on Hamilton, Porter cites testimony that Hamilton gave during Bates's trial:

> Q.   Did there come a point in time when you learned of the connection between the gun that was used in your--the killing of [Wilmore] to Walter Porter?
>
> A.   From Detective Orlando Matthews.

---

Porter also alleges that after seeing news reports containing a photograph of another individual, Joshua Moore, Hamilton told authorities that he was "positive" that Moore was the person who shot and killed Wilmore.  According to Porter, despite this initial confidence, Hamilton was expressed uncertainty as to Moore's involvement when he was presented with a six-person photo array containing Moore's image.

Q.    And what did you learn?

A.    About the ballistics of the gun.  And that it was with Walter Porter and what we was shot with, and that's what made me start connecting the two together.  Because Walter Porter used to hang out at the carwash.[10]

Other than Detective Matthews's disclosure concerning a ballistic link, Porter does not allege any other instances of suggestive police conduct.

## C.    Porter's Motion to Suppress

Porter moves to suppress all identifications of Porter by Matthews. Porter argues that "Hamilton's mind crystallized around" Porter as a result of Detective Matthews's impermissible influence.  He contends that the Court must therefore suppress all of Hamilton's out-of-court identifications of Porter, as well as any in-court identification that Hamilton might provide at trial of Porter at the carwash, on December 25, 2010, or at the Wilmore homicide."[11]  The Government opposes the motion.

---

[10] R. Doc. 313-1.

[11] *Id.* at 14.

## II.    DISCUSSION

### A.    Evidentiary Hearing

As an initial matter, the Court finds it unnecessary to hold an evidentiary hearing on Porter's motion to suppress.  "An evidentiary hearing is required on a motion to suppress only when necessary to receive evidence on an issue of fact."  *United States v. Harrelson*, 705 F.2d 733, 737 (5th Cir. 1983).  Because there are no factual issues in dispute that are material to Porter's motion, the Court will resolve the motion to suppress on the briefs.  *United States v. Kirk*, 528 F.2d 1057, 1064 (5th Cir. 1976) (finding that it was appropriate for trial court to decide suppression motion without an evidentiary hearing when the issue was one of law).

### B.    Suppression of Hamilton's Identifications of Porter

In his motion, Porter alleges that the Court must suppress any and all out-of-court and in-court identifications of Porter by Hamilton.  Porter's motion references three identifications in particular:

- Hamilton's identification of Porter as one of the two gunmen who broke into Hamilton's home on June 11, 2011, shooting and injuring Hamilton and shooting and killing Wilmore.

8

- Hamilton's identification of Porter in a January 15, 2013 photo lineup as an "individual visiting [Bates's] car wash on a daily basis."[12]

- Hamilton's identification of Porter as present when Bates visited Hamilton asking for money on December 25, 2010.

The Court addresses each identification in turn.

### 1. *Hamilton's Identification of Porter as one of the Gunmen in the June 11, 2011 Home Invasion*

First, Porter argues that the Court must suppress any in-court identification by Hamilton indicating that Porter was one of the gunmen who broke into Hamilton's residence on June 11, 2011, shot Hamilton, and killed Wilmore. Citing testimony that Hamilton gave during the June 2015 trial of Porter's co-defendant, Bates, Porter argues that this identification is unreliable and resulted from impermissibly suggestive remarks made to Hamilton by an NOPD detective. While the Government filed an opposition memorandum,[13] it submits that it does not intend to introduce evidence of the June 11, 2011 murder of Wilmore and attempted murder of Hamilton against Porter in this case.[14] In light of the Government's submission, the Court need not rule on Porter's motion to suppress any in-court identification by Hamilton suggesting

---

[12] *Id.* at 14.

[13] R. Doc. 336.

[14] R. Doc. 366.

Porter's involvement in the June 11, 2011 shootings.  Should the Government change course, the Court will decide the relevant issues at that time.  The Government shall notify the Court in advance of any change of position regarding the proffered use of this evidence.

### 2.   Hamilton's Photo Array Identification of Porter as an Individual "Visiting the Car Wash on a Daily Basis"

Second, Porter objects to Hamilton's identification of Porter as one of the individuals who frequently visited Bates's carwash.  As noted, during Bates's trial in June 2015, Hamilton testified that he frequently visited Bates's carwash and that during the period following Christopher Smith's murder, he began to notice that two individuals came to the carwash frequently in a white Trailblazer.  Hamilton further testified that Bates told Hamilton that he owed the men money for "a $10,000 hit" and that they were "looking for their money."  In January 2013, law enforcement officers interviewed Hamilton in connection with the Christopher Smith murder.  During that interview, FBI Special Agent Keith Burris and Jefferson Parish Detective Jeffrey Rodrigue presented Hamilton a six-person photo array that included Porter's image.[15] Hamilton identified Porter's photograph and signed and dated the photo

---

[15] R. Doc. 313-13.

10

array.  On the back of that document, Hamilton wrote "Individual visiting car wash on a daily basis."[16]  Porter argues that this photo identification resulted from impermissibly suggestive and "shoddy" police practices and that the Court must suppress the out-of-court identification and in-court testimony concerning that identification.

The Supreme Court has held that the Due Process Clause of the Fifth Amendment guarantees criminal defendants the right to exclude identification testimony that results from unnecessarily suggestive procedures that are conducive to mistaken identification.  *See Perry v. New Hampshire*, 132 S. Ct. 716, 724-25 (2012); *Stovall v. Denno*, 388 U.S. 293, 302 (1967).  The test for determining the admissibility of an in-court identification is two-pronged.  First, a court must determine whether the pretrial identification procedure was impermissibly suggestive.  *Neil v. Biggers*, 409 U.S. 188, 198-99 (1972); *Livingston v. Johnson*, 107 F.3d 297, 309 (5th Cir. 1997).  If the identification procedure was not impermissibly suggestive, the inquiry ends.  *See United States v. Honer*, 225 F.3d 549, 553 (5th Cir. 2000); *Livingston*, 107 F.3d at 309.  If the procedure was impermissibly suggestive, the Court must determine "whether based on the totality of the circumstances, the [procedure]

---

[16] R. Doc. 313-14.

posed a very substantial likelihood of irreparable misidentification." *Honer*, 225 F.3d at 553.  The Supreme Court has set forth five factors that bear on the likelihood of irreparable misidentification: (1) the witness's opportunity to view the perpetrator at the time of the crime; (2) the witness's degree of attention; (3) the accuracy of the witness's prior description; (4) the level of certainty demonstrated when making the identification; and (5) the time between the crime and the identification. *Biggers*, 409 U.S. at 199-200; *see also United States v. Burbridge*, 252 F.3d 775, 780 (5th Cir. 2001).

### a.    *Suggestiveness of Identification Procedures*

Hamilton identified Porter as one of the individuals at Bates's carwash from a six-person photo array.   Generally, in determining whether a photographic identification was impermissibly suggestive, a court need only evaluate the photo array itself and the facts surrounding its presentation. *United States v. Kimbrough*, 481 F.2d 421, 424 (5th Cir. 1973) (citing *United States v. Sutherland*, 428 F.2d 1152, 1156 (5th Cir. 1970)).  "Whether other more desirable methods of identification . . . were available, or whether there was a compelling need for speedy identification, are just not relevant to a determination of the impermissibly suggestive issue." *Id.* at 424-25.

Here, Porter does not allege that the photo array was suggestively composed.  There is no allegation, for instance, that the other individuals in

the array had physical characteristics "drastically dissimilar" to Porter's, "thus clearly singling him out and suggesting him for identification . . . ." *United States v. Taylor*, 530 F.2d 639, 641 (5th Cir. 1976); *see also Simmons v. United States*, 390 U.S. 377, 383 (1968) (noting that photo array may be impermissibly suggestive when the defendant's photograph "recurs or is in some way emphasized").[17]  Nor does Porter allege that Detective Rodrigue or Special Agent Burris made any suggestive statements or presented the array in a manner that might single out Porter for identification.  Absent a plausible allegation that the photo identification procedure was tainted by impermissibly suggestive police conduct, Porter's motion to suppress must fail.  *See Reese v. Cain*, 265 F. App'x 230, 231-32 (5th Cir. 2008) (finding that suppression of photo identification was not warranted because even if witnesses were told that suspect was in custody before viewing the photo array, defendant failed to substantiate his conclusory assertion that the array was suggestively composed); *United States v. Lang*, No. CRIM A.04-11, 2005 WL 517337, at *3 (E.D. La. Mar. 2, 2005) (holding that suppression of photo

---

[17] Indeed, having reviewed the photo array--which consists of six photographs of equal size, each set against a blue background, and each depicting an African American man with short hair and similar facial features--the Court finds that the array is not impermissibly suggestive.

array identification was unwarranted when neither the photographs nor the "overall presentation of the photographic line-up . . . was unduly suggestive).

To resist this conclusion, Porter argues in general terms that Hamilton's photo identification was unreliable because it occurred after Detective Matthews made suggestive statements to Hamilton about Porter. Porter's own motion makes clear, however, that Detective Matthews's statements did not concern the Christopher Smith murder or Porter's presence at Bates's carwash following that event. Rather, those statements dealt with the ballistics evidence developed in NOPD's investigation into the June 11, 2011 shooting of Hamilton and Wilmore at Hamilton's residence, a crime that is not at issue in this case. Porter contends that although Detective Matthews made his statement in connection with a different criminal investigation, he nonetheless affected Hamilton's ability to determine whether Porter was one of the men who frequented Bates's carwash in a white Trailblazer. Beyond his conclusory assertion that Detective Matthews caused Hamilton's mind to "crystallize around Mr. Porter and his presence at the carwash,"[18] however, Porter provides no specific factual allegations to support his position. *See United States v. de la Fuente*, 548 F.2d 528, 534 (5th Cir. 1977) (holding that

---

[18] *Id.* at 1.

"defendants must at least allege particular facts which would tend to indicate some government impropriety and that general, conclusory allegations based upon mere suspicions do not entitle a defendant to have evidence suppressed").  As noted, the shooting at Hamilton's residence and Porter's alleged visits to Bate's carwash occurred at different periods of time.  These events were investigated at different times and by different law enforcement entities.  Thus, even accepting as true Porter's allegations of misconduct by NOPD Detective Matthews in late 2011, Porter has failed to demonstrate that the photo identification procedures that Special Agent Burris and Jefferson Parish Detective Rodrigue employed in January 2013 were constitutionally defective. *See United States v. Caicedo-Asprilla*, 632 F.2d 1161, 1169 (5th Cir. 1980) (holding that "to be constitutionally offensive, the allegedly impermissible suggestivity must have a nexus with the purpose or probative value of the questioned testimony" and that suppression is unwarranted when the information that the offensive procedure suggests "is uncontested or not closely linked to the purpose or probative value of the testimony derived" from that procedure).

Because Porter has failed to carry his burden of establishing that Hamilton's photo identification resulted from an impermissibly suggestive procedure, the Court need not consider the second prong of the test, and

15

Porter's motion must fail.   *See Livingston*, 107 F.3d at 309 ("If the identification procedure is not impermissibly suggestive, the inquiry ends."); *see also United States v. Sanchez*, 24 F.3d 1259, 1262 (10th Cir. 1994) ("These two prongs must be analyzed separately, and it is only necessary to reach the second prong if the court first determines that the array was impermissibly suggestive.").

### b.    Reliability of Identification

Even if the photo identification were impermissibly suggestive, however, the record does not establish a substantial likelihood of misidentification. During the June 2015 trial of Porter's co-defendant, Bates, Hamilton testified at length concerning his observations of Porter at Bates's carwash.  Hamilton was cross-examined, and the trial transcript is available to Porter as part of the public record.  Having reviewed this record and the parties' briefs, the Court finds that upon weighing the five factors of reliability set forth by the Supreme Court, Hamilton's photo identification of Porter is sufficiently reliable and need not be suppressed. *Biggers*, 409 U.S. at 199; *Brathwaite*, 432 U.S. at 114.

As to the first two factors, Hamilton's opportunity to view Porter and his degree of attention, Hamilton testified that he regularly spent time at Bates's carwash, where he would have conversations with Bates.  He further testified

that on one occasion, he inquired about Bates's black Mercedes Benz.[19] According to Hamilton, Bates responded that he had placed "a $10,000 hit" and that the murderers had taken the car for collateral.[20]  Hamilton further testified that during this period, he began to notice that two individuals came to the carwash frequently in a white Trailblazer.  On one occasion, Bates told Hamilton "Well, there they go.  They're looking for their money," which prompted Hamilton to memorize the white Trailblazer's license plate number.[21]  When asked how many times he saw the two men at the carwash, Hamilton testified: "I seen them several--or maybe a dozen times."[22]  As this testimony indicates, Hamilton saw the white Trailblazer frequently over an extended period of time, giving him ample opportunity to observe its occupants.  Alerted to the two individuals' possible involvement in a "$10,000 hit," Hamilton paid close attention during their visits, even committing the vehicle's license plate number to memory.  These factors weigh heavily in favor of a finding of reliability.  *See McFadden v. Cabana*, 851 F.2d 784, 786, 790 (5th Cir. 1988), *cert. denied*, 489 U.S. 1083 (1989) (finding that reliability was

---

[19] Hamilton's Trial Testimony, at 14.

[20] *Id.* at 14-15.

[21] *Id.* at 16-17.

[22] *Id.* at 19.

strengthened when witnesses viewed robbers for about fifteen minutes at noon in a well-lit store); *United States v. Brown*, No. CRIM.A. 08-87, 2008 WL 4724307, at *4 (E.D. La. Oct. 24, 2008) (finding bank teller's identification of robber reliable when witness had a good view of the robber and ample time to observe him).

As to Hamilton's level of certainty, when law enforcement presented Hamilton the six-person photo array, Hamilton identified Porter as one of the men who frequented Bates's carwash.  At trial, Hamilton made the same identification confidently and without hesitation.  This also weighs in favor of a finding of reliability. *See United States v. Gatti*, No. CIV. 06-0411, 2008 WL 4500329, at *5 (W.D. La. Oct. 3, 2008) (finding that reliability was strengthened when witness testified to shooter's identity "without hesitation and without even a hint of doubt").  Lending further reliability to Hamilton's identification is that substantial portions of his testimony during the Bates trial were corroborated by other evidence.  For instance,  consistent with Hamilton's account, Aaron Smith testified that in the days and months following Christopher Smith's murder, Aaron Smith and Porter went to Bates's carwash on multiple occasions in attempts to collect payment for the "hit."  In addition, testimony from an historical cell site expert indicated that Porter was

18

in the vicinity of Bates's carwash on multiple occasions during the period immediately following Christopher Smith's death.

The only factor that weighs against reliability is time.[23] Two years passed between Hamilton's observations of Porter at Bates's carwash and his January 2013 photo identification.  Although relevant to the analysis, this factor alone not does not render Hamilton's identification inadmissible.  *See, e.g., United States v. Larkin*, 978 F.2d 964, 970 (7th Cir. 1992) (upholding the admission of identification testimony in a robbery case where lineups occurred after a period of ten months and two years and two months, respectively, from the time of the robbery); *United States v. Williams*, 596 F.2d 44, 49 (2nd Cir. 1979) (upholding admission of identification testimony based upon the other reliability factors when the time between the crime and the identification was two years and eight months); *see also United States v. McCray*, 948 F. Supp. 620, 624 (E.D. Tex. 1996), *aff'd in part, vacated in part sub nom.*, 179 F.3d 230 (5th Cir. 1999) (concluding in a case involving a delay of two years and two months that "[w]hile this delay . . . is hardly ideal, it is certainly not unprecedented, and does not of itself disqualify identification testimony").

---

[23] The third *Biggers* factor, the accuracy of any description that the witness made prior to making his or her identification, is not relevant on these facts.  Neither Porter nor the Government has indicated that Hamilton provided a description of the men who frequented Bates's carwash at any point prior to his selection of Porter from the six-person photo array.

On balance the Court finds that these factors weigh in favor of a finding that Hamilton's January 2013 photo identification was reliable. Thus, even if Detective Matthews's statements to Hamilton in October and November 2011 rendered the identification procedure impermissibly suggestive, suppression is unwarranted.

### 3. Hamilton's Identification of Porter as Being Present at Hamilton's Residence on December 25, 2010

Finally, Porter argues that the Court must suppress Hamilton's identification of Porter as being present at Hamilton's residence on December 25, 2010. As noted, during Bates's trial, Hamilton testified that on that date Bates went to Hamilton's house and asked him for money. Contrary to Porter's assertion, however, Hamilton never testified that he saw Porter on that day.[24] Rather, Hamilton testified that when Bates arrived at his front door, Hamilton saw the white Trailblazer from the carwash parked at the curb. On direct examination, Hamilton admitted that because it was night he was unable to see who was inside the vehicle.[25] Hamilton reiterated this point

---

[24] To the extent that Porter relies on a characterization of Hamilton's testimony in a previous order, the testimony speaks for itself.

[25] R. Doc. 313-4 at 20.

20

during cross examination, stating that because of the darkness "I couldn't see individuals, but I recognized the vehicle."[26]

The parties have given the Court no reason to believe that Hamilton's testimony will be different during Porter's trial.  Because Hamilton has never indicated that he saw Porter on December 25, 2010, the Court need not rule on Porter's motion to suppress in-court identifications by Hamilton suggesting Porter's presence at Hamilton's house on that date.  Should Hamilton's testimony on this point differ substantially during Porter's trial, the Court will decide the relevant issues at that time.

## III.  CONCLUSION

For the foregoing reasons, the Court DENIES Porter's motion to suppress.

New Orleans, Louisiana, this 23rd day of February, 2016.

_Sarah Vance_

SARAH S. VANCE
UNITED STATES DISTRICT JUDGE

--------------------------------

[26] Id. at 30.